# State of New York
# Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 59  SSM 2
The People &c.,
          Respondent,
     v.
Alexis Rodriguez,
          Appellant.

Submitted by Paul J. Connolly, for appellant.
Submitted by Peter Willis, for respondent.

MEMORANDUM:

The order of the Appellate Division should be affirmed.  As part of a plea agreement and in exchange for a favorable sentence, defendant entered into a written cooperation agreement whereby he promised to "cooperate completely and truthfully with law

- 1 -

enforcement authorities, including the police and the District Attorney's Office, on all matters in which his cooperation is requested, including but not limited to the prosecution of [defendant's accomplices] on charges related to the murder of Jose Sanchez and the assault of [Sanchez's brother]." Prior to entering into the cooperation agreement, defendant had confessed to his involvement in the Sanchez murder and assault, explaining that the crimes were retaliation for a prior invasion of defendant's home by Sanchez and his associates, including Jose Marin. When defendant signed the agreement, he already had testified to Marin's involvement in the home invasion before the grand jury in the Sanchez matter, and he also had assisted the police with their investigation of the home invasion by identifying Marin in a photo array.

The cooperation agreement cautioned defendant that a "fail[ure] to fully and successfully cooperate" would result in forfeiture of the sentencing promise and imposition of an enhanced sentence. Before County Court accepted his guilty plea, defendant confirmed on the record that he understood this aspect of the cooperation agreement. Defendant pleaded guilty to murder and assault, and he was subsequently sentenced on the murder count. Upon consent of the parties, sentencing on the assault count was postponed until defendant had fulfilled his obligations under the cooperation agreement. Before imposition of that sentence, the District Attorney's Office requested that defendant testify against Marin in connection with the prosecution of the home invasion. Defendant refused.

On this record, County Court did not err when it determined that defendant's refusal to testify against Marin violated the express terms of his cooperation agreement. The plain language of the agreement was objectively susceptible to but one interpretation (see People

v Cataldo, 39 NY2d 578, 580 [1976]). County Court, therefore, did not abuse its discretion by denying defendant's motion to withdraw his guilty plea based on his claimed subjective misinterpretation of the agreement or by concluding, to the contrary, that defendant reasonably understood that his cooperation in the Marin prosecution was required (see id.; see also People v Collier, 22 NY3d 429, 433 [2013]). Defendant's ineffective assistance of counsel argument likewise lacks merit (see People v Manor, 27 NY3d 1012, 1014 [2016]).

People v Alexis Rodriguez

SSM No. 2

RIVERA, J. (dissenting):

This appeal presents an open question that this Court has never addressed: what interpretive standards apply to the terms of a cooperation agreement when, as here, a defendant claims to have neither intended nor understood the agreement to include the

- 1 -

People's demand for assistance with an unspecified criminal investigation or prosecution? Rather than tackle that issue head on, the majority affirms the Appellate Division's order in a single sentence analysis that is short on reasoning and creates confusion in this undeveloped area. Our constitutional role is to provide guidance to our State's courts and bar by providing clear rules of legal analysis. In the case of cooperation agreements, those bargained-for-promises are subject to our traditional rules of contract interpretation. Applying those rules here, I conclude that defendant's cooperation agreement is limited in scope to the crimes for which he pleaded guilty. Therefore, defendant did not violate the agreement when he refused to testify against an individual charged with a different, prior crime against defendant and his family. Accordingly, it was error for County Court to deny defendant's motion to withdraw his guilty plea upon that court's refusal to sentence defendant to the consecutive terms he bargained for. I dissent.[1]

I.

---

[1] Defendant stresses that "[t]his appeal presents issues concerning the construction of plea agreements, by which the overwhelming majority of criminal prosecutions in this state are resolved," that it specifically raises the important issue of how a court is to construe a cooperation agreement that purports to require a defendant's unlimited cooperation, and that resolution of these issues is of especially great significance to defendant since it determines whether he serves 20 years to life or 40 years to life in prison. To that end, defendant objects to placement of his appeal on our alternative review track (see Rules of Ct of Appeals [22 NYCRR] § 500.11 [b]). As I have previously stated, once a majority of the Court chooses to maintain the appeal on the SSM track, notwithstanding a party's objection, we must consider the issues in the posture presented (see Matter of Luis P., 32 NY3d 1165, 1167 n 2 [2018] [Rivera, J., dissenting]). For the reasons I discuss in this dissent, based on the record and the SSM letter submissions, I would reverse the Appellate Division.

The Cooperation Agreement, Defendant's Sentence and the Motion to Withdraw his

Guilty Plea

Defendant Alexis Rodriguez and his family were victims of a home invasion burglary arising from a dispute between defendant and Jose Sanchez. Defendant owed money to Sanchez for his help registering and insuring a minivan. Sanchez and three accomplices — Sanchez's two brothers and a man later identified as Victor Marin — entered defendant's home and brandished weapons at defendant and his family. Defendant told the men to take the minivan in place of the money he owed, which they did. Before leaving, Marin threatened defendant and his family that anyone who reported the incident to the police would be killed.

About a month later, defendant and three accomplices armed with guns went to Sanchez's house intending to retrieve the vehicle. A fight ensued, during which defendant's accomplices fought and stabbed one of Sanchez's brothers. One of the accomplices then stabbed Sanchez, another shot him multiple times, and after Sanchez fell to the ground, defendant shot Sanchez several more times.

Defendant was arrested for Sanchez's murder and the stabbing and beating of Sanchez's brother. Defendant confessed and told the police about the home invasion to explain the motive for his crimes. The People offered a plea bargain to defendant that required his cooperation with law enforcement. During the negotiations but before signing a written agreement, defendant was shown a photo array from which he identified Marin as a participant in the home invasion. Defendant previously knew Marin only by nickname.

Defendant also waived immunity and testified before a grand jury regarding Sanchez's murder. During this testimony defendant again described his motive for the murder as the home invasion and stated that Marin was one of the participants in that prior crime. The People explained to the grand jury that defendant's testimony was relevant only as to the motive behind the murder of Sanchez and the assault on Sanchez's brother. Nevertheless, based on that testimony, the People successfully requested the grand jury consider charges against Marin for burglary in the first degree.

Thereafter, defendant signed a written plea and cooperation agreement. The agreement provides, in relevant part, that "Defendant will cooperate completely and truthfully with law enforcement authorities, including the police and the District Attorney's Office, on all matters in which his cooperation is requested including but not limited to the prosecution of [defendant's accomplices] on charges related to the murder of Jose Sanchez and the assault of [Sanchez brother]." The agreement also stated that "Defendant hereby verifies, and it is a condition of this agreement, that his Grand Jury testimony . . . regarding this murder and assault was truthful. It is a condition of this agreement that he agree to look at photo array compilations in an attempt to identify the other two accomplices."

Pursuant to the agreement, defendant would plead guilty to murder in the second degree and assault in the first degree. In exchange for his plea and cooperation, he would be sentenced to 20 years to life in prison on the murder count and a concurrent sentence of 20 years in prison, followed by five years' post-release supervision on the assault count. If defendant failed to comply with the cooperation agreement, he would be sentenced to a

consecutive term of 10 to 20 years in prison on his plea to the assault. Accordingly, upon defendant's plea, the court sentenced him to 20 years to life in prison for the murder conviction and adjourned sentencing on the assault conviction pending defendant's compliance with the cooperation agreement.

Approximately ten months after entering into the cooperation agreement and pleading guilty, the People requested that defendant testify against Marin in Marin's burglary trial for the home invasion committed against defendant and his family. Defendant refused to testify. He maintained that the agreement did not require this testimony and he was afraid for his family's safety.

After the court warned defendant that it would view the cooperation agreement as requiring him to testify in Marin's trial, defendant filed a motion to withdraw his guilty plea on the ground that the plea was not knowing, intelligent, and voluntary. Defendant attested by affidavit that he had a justifiable belief that the cooperation agreement only required him to cooperate in the murder and assault prosecution and had he known the People would require him to testify at a public trial regarding the burglary and home invasion he would have rejected the agreement out of concern for his family's safety. In opposition to the motion, the People conceded that the agreement does not mention Marin or the home invasion, but they argued that because defendant picked Marin out of an array and mentioned him in his grand jury testimony the agreement should be read to include his cooperation on "the case in which his family were victims." County Court denied defendant's motion, noting the broad language in the agreement, and that defendant had

already cooperated in the "case" against Marin. The court further concluded that defendant violated the terms of the agreement by refusing to testify, and therefore it imposed a consecutive term of 20 years in prison for the assault conviction.

The Appellate Division, with two Justices dissenting, affirmed the judgment convicting defendant upon his guilty plea to assault in the first degree (People v Rodriguez, 164 AD3d 1024 [3d Dept 2018]). The majority held that the cooperation agreement "did not limit [defendant's] obligation to cooperate with the People solely with respect to Sanchez's murder and the assault of Sanchez's brother, but rather applied to 'all matters in which his cooperation [was] requested'" (id. at 1026). The majority rejected defendant's argument that the agreement's language was "fatally overbroad" because, according to the majority, the two crimes were "inextricably intertwined" (id.). The two dissenting Justices concluded that the cooperation agreement did not include defendant's public testimony at Marin's trial because defendant testified about the home invasion in the grand jury solely to explain the motive for the assault and murder and had made it clear to law enforcement from the very beginning that Sanchez and Marin had threatened to kill his family if he reported the home invasion (id. at 1027–1028 [Lynch, J., dissenting]). Therefore, because defendant did not violate the cooperation agreement, consecutive sentences should not have been imposed (id.). One of the dissenting Justices granted defendant leave to appeal to this Court (32 NY3d 943 [2018]).

## II.

## Applicable Legal Standards

Defendant argues that the cooperation agreement, by its plain terms, encompasses only defendant's cooperation as to the murder and assault crimes because it includes no mention of the home invasion. Defendant further maintains that even if construction of the agreement required consideration of extrinsic evidence, a review of the circumstances surrounding the formation of the agreement establishes that defendant and the People understood that defendant was agreeing to cooperate solely in the prosecution of the murder and assault.

The People respond that "[t]he agreement clearly contemplated [defendant's] continued cooperation and explicitly expanded the scope of the cooperation so that the People would be free to utilize [defendant] as a witness whenever he was needed, and for any crime for which he was needed." Under the People's interpretation of the agreement, defendant should have known that the police and prosecutor would seek his cooperation on crimes that he had already discussed with them, which included the home invasion.[2]

The Court has never articulated the standard by which a court may interpret the terms and conditions of a defendant's cooperation agreement with the People. Such agreements set forth the understanding between a defendant and the State as to the

---

[2] The People's alternative argument that the Court lacks jurisdiction to consider this appeal because it is a mixed question of fact and law with record support, is easily disposed of as wholly without merit. The proper interpretation of a cooperation agreement—like any contract or bargained for promise—is a question of law reviewable by this Court (see, e.g., Burlington Ins. Co. v NYC Tr. Auth., 29 NY3d 313, 321 [2017].

bargained for promises of the respective parties. In return for a defendant's cooperation with a criminal investigation and prosecution, the defendant gains something meaningful in exchange. Here, it is undisputed that the People and defendant intended that, if he cooperated in accordance with the agreement, the court would run his second-degree murder and first-degree assault sentences concurrently, but any violation would result in consecutive sentences for these two counts. To that end, upon defendant's plea, the court sentenced him on the murder count and adjourned the sentence on the assault count to ensure defendant's compliance with the agreement. The cooperation agreement has all the hallmarks of a bargained-for promise and should be subject to traditional rules of contract interpretation. The application of contract doctrine to a cooperation agreement is supported by prior case law recognizing that a defendant is entitled to the contractual remedy of specific performance of a plea bargain (People v McConnell, 49 NY2d 340, 343 [1980]). Thus, there is no principled reason to adopt different interpretive rules to a cooperation agreement which sets the terms by which defendant agrees to plea.

"The best evidence of what parties to a written agreement intend is what they say in their writing" (Slamow v Del Col, 79 NY2d 1016, 1018 [1992]). Under longstanding rules of contract interpretation, "[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole" (Ellington v EMI Music, Inc., 24 NY3d 239, 244 [2014] citing Greenfield v Philles Records, 98 NY2d 562, 569 [2002]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162–163 [1990]). The

agreement is unambiguous if the language it uses has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion" (Breed v Ins. Co. of N. Am., 46 NY2d 351, 355 [1978]). However, where the agreement is ambiguous, a court may look beyond the four corners of the parties' agreement (Greenfield, 98 NY2d at 569). "[E]vidence outside the four corners of the document— . . . is admissible only if a court finds ambiguity in the contract. As a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement" (Schron v Troutman Sanders LLP, 20 NY3d 430, 436 [2013]).

III.

The Scope of the Cooperation Agreement

Defendant persuasively argues that he did not understand the cooperation agreement to encompass his testimony at Marin's burglary trial. First, because the agreement does not reference the home invasion or Marin, and second, even apart from the language itself, the circumstances surrounding formation of the agreement establish that defendant would not have understood that he was required to assist in prosecuting Marin.

A.  Plain Language of the Agreement

As is obvious from the plain language of the cooperation agreement, and undisputed by the People, the writing does not expressly mention the home invasion or Marin. Yet, and in notable contrast, the agreement unambiguously explains that defendant must cooperate with law enforcement in the investigation and prosecution of the murder

and assault. Specifically, the agreement refers to the "pending case"—the murder and assault prosecution — and the prosecution of defendant's accomplices to these crimes. Further, the agreement required that defendant look at a photo array to identify his "two accomplices" from the murder and assault, which he previously identified only by their nicknames, but makes no mention of Marin or the prior crime.

Nor can the agreement's condition that defendant's grand jury testimony "regarding this murder and assault was truthful" be read to mean that defendant was required to testify in a separate public trial in another case against someone who was not an accomplice and not even present during the murder and assault. The fact that in the grand jury defendant referenced the home invasion to explain his motive for the crimes to which he eventually pleaded guilty to does not affect the analysis since even the People instructed the grand jury to consider that testimony solely for purposes of deciding whether to charge on the murder and assault.

The absence of specific language referencing a particular promise ordinarily ends the inquiry as the court may not rewrite a contract to include terms the parties have expressly omitted (Greenfield, 98 NY2d at 569-570 ["(i)f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity"]). Silence is not an invitation to judicial redrafting.

B.  Extrinsic Evidence of Defendant's Agreed to Promises

In an effort to fit their proposed broad interpretation within the confines of our contract interpretive rules, the People point to a catchall requirement in the agreement that provides defendant will cooperate "on all matters in which his cooperation is requested, including but not limited to" the murder and assault prosecution. The People argue this phrase establishes that defendant would cooperate with law enforcement in the home invasion investigation and prosecution because defendant understood that at a minimum this language referred to all the crimes he had discussed with the police and District Attorney's office up to that point.

This language cannot operate as the People claim because the text is overbroad and vague, and also because it relies on an interpretation contradicted by defendant's statements and the events surrounding the contract formation. As to the first deficiency, reading the language as the People suggest would render the agreement a nullity (see e.g. Benjamin Rush Employees United v McCarthy, 76 NY2d 781, 782 [1990]). There is no severance provision that would salvage such a flawed agreement.

As to the second deficiency, the People are hard pressed to establish that defendant understood he was promising to publicly testify against Marin in exchange for consecutive sentences for the murder and assault crimes. Assuming, arguendo, the catchall language renders the scope of the agreement ambiguous, under our rules of contract we then consider the circumstances surrounding the formation of the agreement to determine the parties' understanding at that time to determine whether they have a shared intent as to the meaning

of the terms. In other words, we look to see if there exists the proverbial "meeting of the minds" (Stonehill Capital Management, LLC v Bank of the West, 28 NY3d 439, 448 [2016], quoting Farago v Burke, 262 NY 229, 231 [1933]; see also Express Industries and Terminal Corp. v New York State Dept. of Transp., 93 NY2d 584, 590 [1999] ["there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms"]). Here, there was no shared understanding for anything other than defendant's cooperation with the crimes he and his accomplices committed against Sanchez and his brother.

As thoroughly discussed by the Appellate Division dissent, the circumstances surrounding the formation of this agreement do not establish that defendant—or the People at the time—understood the agreement to require the defendant's cooperation in the investigation and prosecution of the home invasion. As the dissent below reasoned, the omission of any mention of Marin in the cooperation agreement "is consistent with the main focus of the police investigation, which was to identify and prosecute the accomplices involved in the murder and assault of Sanchez and his brother" (Rodriguez, 164 AD3d at 1027). In the grand jury, the People made abundantly clear on the record that defendant was being asked about the home invasion only because it was relevant to the murder of Sanchez and the assault on Sanchez's brother. Significantly, although the cooperation agreement eventually signed by defendant mirrored a prior draft that predated his grand jury testimony, the final agreement never mentioned Marin. It is implausible to read the agreement to require defendant's public testimony against Marin for the home invasion

when at the time of defendant's confession he had informed police that Sanchez and Marin had threatened to kill his family if any of them reported the home invasion. Indeed, defendant has never filed a complaint against Marin, and the only times he mentioned him was to the police and in the secrecy of the grand jury proceedings to explain his motive for his own crimes. Finally, defendant refused to testify at Marin's burglary trial over concerns for his family's safety and even after the court explicitly warned him that he faced an additional 20 years in prison for not testifying. Defendant surely would not have entered an agreement to plead guilty knowing at the time that he could never fulfill the promise without endangering his family, thus ensuring an added two decades of incarceration without any commensurate benefit.

IV.

Defendant's Motion to Withdraw His Plea

As I have explained, the cooperation agreement cannot be construed to require defendant's testimony against Marin. The majority disagrees, pronouncing without further explanation that the "agreement was objectively susceptible to but one interpretation" (majority op at 2). The majority's citation to People v Cataldo (39 NY2d 578 [1976]), sheds no light on the standards or analysis that lead to this conclusion, and the reference, like the majority "opinion," fails to provide guiding principles for courts to interpret such agreements in the future. Cataldo is particularly inapt because it is a memorandum order devoid of a single citation and does not even involve a cooperation agreement. The Court in Cataldo held that a defendant may not withdraw a plea where the court complies with

the promises it made when it accepted the plea (id. at 580). In Cataldo, the trial court explained the exact terms of the bargain at the time of the plea, which, as relevant to the appeal, included the court's promise that if the Probation Department recommended a term of imprisonment, the court would follow the recommendation, with a maximum not in excess of five years. The court then imposed the indeterminate term of imprisonment with a five-year maximum recommended by the Department. Cataldo is not applicable here where the question presented is the proper interpretation of an agreement that the People argue, in part, requires consideration beyond the four corners of the document.

The majority's citation to People v Manor (27 NY3d 1012 [2016]), appears to suggest that case supports County Court's denial of defendant's motion to withdraw. Manor is another easily distinguishable memorandum opinion which involved a defendant's motion to withdraw his guilty plea on the ground that he was under the influence of alcohol and marijuana at the time of the plea (id. at 1013). The question presented in Manor was whether County Court abused its discretion in denying defendant's motion without a hearing. This Court held there was no abuse of discretion because defendant had a fair opportunity to argue the motion on written submissions, family coercion was not grounds to withdraw the plea, and defendant was silent at the time of the plea as to his alleged use of alcohol and drugs. The appeal did not require the Court to interpret the plea agreement—thus, not even by analogy is the case applicable here.

Under the cooperation agreement, defendant entered a guilty plea for the murder and assault charges in exchange for a specified term of concurrent sentences. He did so

without understanding that the sentencing promise was conditioned on his testimony against Marin at Marin's burglary trial. Thus, County Court erred when it refused to impose a concurrent sentence on the ground that defendant violated a term not encompassed by the agreement, and the Appellate Division erroneously upheld defendant's conviction on the same reasoning. Defendant should have been sentenced to a concurrent sentence on the assault conviction, or his motion to withdraw the plea should have been granted.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

On review of submissions pursuant to section 500.11 of the Rules, order affirmed, in a memorandum.  Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur. Judge Rivera dissents in an opinion in which Judge Wilson concurs.

Decided April 2, 2019